STATE of Wisconsin, Plaintiff-Respondent,

v.

JIMMIE R.R., Defendant-Appellant.†

Court of Appeals

*No. 98–3046–CR. Oral argument September 14, 1999.—Decided December 8, 1999.*

## 2000 WI App 5

(Also reported in 606 N.W.2d 196.)

†Petition to review denied.

On behalf of the defendant-appellant, the cause was submitted on the briefs of *Martha K. Askins*, assistant state public defender.

On behalf of the plaintiff-respondent, the cause was submitted on the brief of *James E. Doyle*, attorney general, and *Sally L. Wellman*, assistant attorney general.

Before Nettesheim, Anderson and Snyder, JJ.

¶ 1. NETTESHEIM, J. Jimmie R.R. appeals from a judgment of conviction for three counts of first-degree sexual assault and three counts of incest with a child.[1] The judgment followed verdicts of guilty at a jury trial.

¶ 2. On appeal, Jimmie argues that the trial court erred by refusing to strike a juror for cause because the juror's wife had been the victim of a sexual assault as a child. We disagree. We conclude that the challenged juror was not subjectively or objectively biased. Jimmie also argues that the trial court erred by admitting the videotaped testimony of the child victim pursuant to § 908.08(3)(c), STATS. He contends that the State did not establish that the victim understood that "false statements are punishable" as required by the

---

[1] Jimmie R.R. was convicted as a repeat offender.

142

statute. While the tape reveals that the interviewers did not extract that precise understanding from the victim, we hold that the tape, assessed in its totality, satisfied this statutory requirement. Therefore, the trial court did not err by admitting the videotape into evidence.

## FACTS

¶ 3. The convictions resulted from an incident on September 13, 1997. On that day, Cassandra S. claimed that she was sexually assaulted by Jimmie, her father, while she was visiting him in his home. At the time of the assault, Cassandra was five years old. These events came to light because Cassandra's brother, Mitchell S.R., who was also visiting at the time, called their mother, Lori S., after becoming suspicious about what was going on between Cassandra and Jimmie upstairs in Jimmie's bedroom. In response, Lori came to Jimmie's residence and took the children home.

¶ 4. Later that evening, Lori questioned Cassandra about what had happened at Jimmie's house. After some reassurances from Lori that she would not be angry with her, Cassandra described various sexual acts that were performed on her by Jimmie. Lori then called the police and took Cassandra to the hospital for an examination. It was late by the time Lori and Cassandra arrived at the police station, so arrangements were made to return the following Monday for a videotaped interview of Cassandra at the Walworth county courthouse. In the meantime, Jimmie was arrested.

¶ 5. On the following Monday, September 15, 1997, a social worker and an investigator from the Lake Geneva police department conducted the videotaped interview of Cassandra. She described to them

the same events that she had described two days earlier to her mother.

¶ 6. On September 18, 1997, the State filed a criminal complaint against Jimmie charging three counts of first-degree sexual assault of a child contrary to § 948.02(1), STATS., and three counts of incest with a child contrary to § 948.06(1), STATS. Later, the State filed a notice of the videotaped interview of Cassandra and requested a hearing to determine its admissibility under §§ 908.08(2)(b) and 970.03(14)(b), STATS. Judge Robert J. Kennedy conducted a hearing on this request in conjunction with the preliminary hearing on October 3, 1997.

¶ 7. At this hearing, Jimmie argued that the videotape failed to establish that Cassandra understood that "false statements are punishable" at the time the interview was conducted as required by § 908.08(3)(c), STATS. After viewing a portion of the videotape and hearing testimony from a police investigator that the tape was unaltered, Judge Kennedy ruled that the tape satisfied the criteria for admissibility under § 908.08(3). Based on this ruling, Judge Kennedy determined that the tape constituted evidence sufficient to establish probable cause and bound Jimmie over for trial. The ensuing information charged the same offenses as alleged in the complaint.

¶ 8. The matter was then assigned to Judge James L. Carlson for trial. Jimmie again challenged the admissibility of Cassandra's videotaped interview at a motion hearing held before Judge Carlson on January 14, 1998.[2] Judge Carlson ruled that Judge Kennedy had properly admitted the videotape into evi-

_____

[2] Actually, this motion was brought under the label of a motion for stay pending appeal. Jimmie argued for a stay of the trial so that he could appeal Judge Kennedy's bind over based

dence at the preliminary hearing. Acknowledging that Cassandra's interviewers had not used the precise words of the statute, Judge Carlson nonetheless held that "the exact words [did not] have to be put to the child as set forth [in the statute]."

¶ 9. When the case moved forward to trial on January 28, 1998, Jimmie again challenged the videotaped interview of Cassandra. Judge Carlson again rejected the challenge.

¶ 10. As to the second issue on appeal, during the jury selection Judge Carlson asked the prospective jurors whether they, or anyone among their families or friends, had been involved in any situations involving sexual assault. Those who raised their hands were then individually questioned further in the judge's chambers. During this questioning, prospective juror Daniel K. disclosed that his wife had been the victim of a sexual assault when she was a young girl. He explained that he and his wife did not talk about this experience. When Judge Carlson asked if he could make his decision based on the evidence and the law without being swayed by his wife's experience, Daniel K. responded, "I think I could."

¶ 11. Jimmie's counsel then questioned Daniel K., eliciting some additional responses that showed some hesitancy by him on the matter. Based on these answers, counsel requested Judge Carlson to dismiss Daniel K. for cause. Judge Carlson denied the request, finding that Daniel K.'s response established that he would "react to the evidence" and decide "on the evidence." Jimmie later exercised one of his peremptory strikes to remove Daniel K. from the jury panel.

on the videotape evidence. Judge Carlson denied the stay because the trial date was imminent.

145

¶ 12. The jury found Jimmie guilty of all the counts charged in the information and a judgment of conviction was entered. Jimmie appeals.

## DISCUSSION

¶ 13. On appeal, Jimmie renews the arguments he made in the trial court. First, he argues that Judge Carlson erred by refusing to strike Daniel K. for cause. Second, he argues that Judge Carlson erred by admitting Cassandra's videotaped interview into evidence.

### 1. Failure to Strike Daniel K. for Cause

¶ 14. As a general principle, a criminal defendant has a right to a fair trial by a panel of impartial jurors. This right is embodied in principles of due process and guaranteed by the Sixth and Fourteenth Amendments to the United States Constitution and Art. I, § 7 of the Wisconsin Constitution. *See State v. Faucher*, 227 Wis. 2d 700, 715, 596 N.W.2d 770, 777 (1999). An impartial juror is one who is "indifferent and capable of basing his or her verdict upon the evidence developed at trial." *Id.* (citing *Irvin v. Dowd*, 366 U.S. 717, 722 (1961)). The requirement that a juror be impartial is also codified in § 805.08(1), STATS. To insure that a juror is impartial, this section directs the trial court to "examine on oath each person who is called as a juror to discover whether the juror . . . has expressed or formed any opinion, or is aware, of any bias or prejudice in the case." *Id.* "If a juror is not indifferent in the case, the juror shall be excused." *Id.* The appearance of bias should also be avoided. *See State v. Louis*, 156 Wis. 2d 470, 478, 457 N.W.2d 484, 488 (1990).

¶ 15. In a recent series of decisions, our supreme court reformulated the terminology for juror bias.[3] The former categories of bias—"implied," "actual" and "inferred"—were replaced by new ones—"statutory," "subjective" and "objective." *See Faucher*, 227 Wis. 2d at 716, 596 N.W.2d at 777.[4] "Statutory bias," the most easily described form of bias, *see id.* at 717, 596 N.W.2d at 778, is not at issue in this case.[5] "Subjective bias" and "objective bias," on the other hand, are squarely before us.

---

[3] The decisions are: *State v. Faucher*, 227 Wis. 2d 700, 596 N.W.2d 770 (1999); *State v. Kiernan*, 227 Wis. 2d 736, 596 N.W.2d 760 (1999); *State v. Erickson*, 227 Wis. 2d 758, 596 N.W.2d 749 (1999), *cert. denied*, 120 S.Ct. 987 (2000); and *State v. Mendoza*, 227 Wis. 2d 838, 596 N.W.2d 736 (1999).

[4] The supreme court cautioned that the new terms do not neatly correspond to the old ones. For purposes of providing guidance, the court acknowledged that "subjective bias" is most like "actual bias" and "objective bias" contemplates use of both "implied" and "inferred" bias. *See Faucher*, 227 Wis. 2d at 716–17, 596 N.W.2d at 777–78. The court also said that "statutory bias" and "subjective bias" most closely corresponded, respectively, to "implied bias" and "actual bias." *See id.* at 716 n.5, 596 N.W.2d at 777.

[5] "Statutory bias," generally corresponding to "implied bias," has its roots in § 805.08(1), STATS., and is premised on the idea that there are specific grounds that automatically disqualify prospective jurors, regardless of whether they are actually biased. *See Faucher*, 227 Wis. 2d at 716 n.5, 596 N.W.2d at 777. In the statutes, this is expressed as situations where a prospective juror "is related by blood or marriage to any party or to any attorney appearing in the case, or has any financial interest in the case." Section 805.08(1).

### a. "Subjective Bias"

¶ 16. "Subjective bias" is "bias that is revealed through the words and the demeanor of the prospective juror." *Id.* Like the prior term "actual bias," "subjective bias" refers to "the prospective juror's state of mind." *Id.* As with any inquiry into a person's state of mind, this is an especially difficult determination to make because there are rarely occasions where there is direct proof in the form of a juror explicitly admitting to a prejudice or an inability to set aside a prejudice. *See id.* at 718, 596 N.W.2d at 778. Usually, a prospective juror's subjective bias will only be revealed through his or her demeanor, and, as a result, the determination often turns on a prospective juror's "responses on *voir dire* and a circuit court's assessment of the individual's honesty and credibility, among other relevant factors." *Id.* This type of determination is one that trial courts are in a superior position to make because they are able to assess the demeanor and disposition of prospective jurors—through nonverbal signals that do not appear in a written record—to determine whether a subjective bias exists. *See id.* As such, a trial court's factual finding that a prospective juror is or is not subjectively biased will be upheld unless it is clearly erroneous. *See id.*

### b. "Objective Bias"

¶ 17. While a "subjective bias" inquiry searches for bias as seen from the individual prospective juror's point of view and state of mind, an "objective bias" inquiry focuses on the "reasonable person in the individual prospective juror's position." *Id.* at 718, 596

N.W.2d at 778–79. In other words, a subjective inquiry decides whether an individual prospective juror possesses a willingness and ability to be impartial, while an objective inquiry would look at that same juror's situation and ask whether a reasonable person in those circumstances could be impartial. *See id.* Important to an objective bias inquiry are the "facts and circumstances surrounding the *voir dire* and the facts involved in the case." *Id.* at 718, 596 N.W.2d at 779.

¶ 18. Under prior case law, appellate review of a trial court's determination as to whether a prospective juror was objectively biased was done under varying standards of review. *See id.* at 719, 596 N.W.2d at 779. As a result, the *Faucher* court sought to create some consistency by announcing that a trial court's "determination on the question of objective bias should be reviewed under a deferential standard." *Id.* The court concluded that objective bias presented a mixed question of fact and law. *See id.* at 720, 596 N.W.2d at 779. Operationally, this means that the trial court's "findings regarding the facts and circumstances surrounding *voir dire* and the case will be upheld unless they are clearly erroneous." *Id.* Whether those facts satisfy the legal standard of objective bias, however, is a question of law. *See id.* But due to the interrelation between the ultimate conclusion regarding objective bias and the trial court's factual findings that serve as its foundation, an appellate court gives weight to the trial court's conclusion on the question of law. *See id.* This conclusion will be reversed only if, as a matter of law, a reasonable judge could not have reached such a conclusion. *See id.* at 721, 596 N.W.2d 780.

149

¶ 19. From our examination of the supreme court's recent decisions, we conclude that the exclusion of a prospective juror for objective bias requires either: (1) some direct or personal connection between the challenged juror and some important aspect of the particular case, or (2) a firmly held negative predisposition by the juror regarding the justice system that precludes the juror from fairly and impartially deciding the case.

¶ 20. For example, in *Faucher*, the prospective juror was acquainted with a key witness for the State and expressed a firmly held opinion that the witness was a "person of integrity . . . [who] wouldn't lie." *See Faucher*, 227 Wis. 2d at 708, 596 N.W.2d at 774. The supreme court held that the trial court's determination that the prospective juror was not subjectively biased was not clearly erroneous. *See id.* at 731, 596 N.W.2d at 784. However, the court concluded that the juror was shown to be objectively biased because "a reasonable person in [the juror's] position could not set the opinion aside despite the best of intentions to do so." *Id.* at 733, 596 N.W.2d at 785.

¶ 21. In *State v. Kiernan*, 227 Wis. 2d 736, 596 N.W.2d 760 (1999), the supreme court ruled that several jurors were objectively biased because they had rejected the same theory of defense tendered by the same defense attorney in a similar case completed several days earlier. The court concluded that the challenged jurors could not judge the instant case solely on the evidence, but rather had effectively decided the case before hearing any of the evidence. *See id.* at 750, 596 N.W.2d at 767. Like the *Faucher* juror who had committed in advance to the credibility of the State's key witness, the *Kiernan* jurors had committed

in advance to a rejection of the defendant's theory of defense.

¶ 22. *State v. Erickson*, 227 Wis. 2d 758, 596 N.W.2d 749 (1999), reveals the opposite side of *Faucher* and *Kiernan*. In *Erickson*, a prospective juror in a sexual assault case had herself been sexually assaulted as a child many years earlier. *See id.* at 762, 596 N.W.2d at 753. The supreme court rejected the defendant's argument that the juror was objectively biased. The court found nothing in the juror's voir dire responses or the trial court's findings that suggested that the juror was anything other than a person who was willing and able to act as an impartial juror. *See id.* at 777, 596 N.W.2d at 759. The court stated that it has been repeatedly reluctant to exclude groups of persons from serving as jurors as a matter of law. *See id.* Unlike the *Faucher* and *Kiernan* jurors, the *Erickson* juror had no direct or personal connection to the case at bar. Nor did her voir dire responses reveal any ingrained predisposition against the judicial system because of her prior experience as the victim of a similar crime.

¶ 23. *State v. Mendoza*, 227 Wis. 2d 838, 596 N.W.2d 736 (1999), represents a combination of the above cases. There, the trial court had dismissed certain prospective jurors because of their past or pending experiences with the criminal justice system. The supreme court held that this "blanket decision" to exclude a class of jurors was error. *See id.* at 853, 596 N.W.2d at 744. Instead, the *Mendoza* court individually analyzed each juror's situation and voir dire responses. *See id.* at 854–56, 596 N.W.2d at 744–45. After this particularized review, the *Mendoza* court concluded that the trial court had properly dismissed three of the prospective jurors because of their hostile and negative attitudes about the criminal justice sys-

151

tem. *See id.* at 856, 596 N.W.2d at 745. However, the *Mendoza* court concluded that a fourth prospective juror was improperly dismissed where the juror's prior conviction was thirty years ago and the juror had responded on voir dire that "he had no problem with the manner in which the police or prosecutor handled [his] case." *Id.*

### c. The Remedy

■

¶ 24. Once a reviewing court determines that a trial court failed to properly dismiss a biased juror for cause, the next step is to determine the remedy. The basic remedy was announced in *State v. Ramos*, 211 Wis. 2d 12, 564 N.W.2d 328 (1997), which held that "the use of a peremptory challenge to correct a trial court error is adequate grounds for reversal because it arbitrarily deprives the defendant of a statutorily granted right." *Id.* at 24–25, 564 N.W.2d at 334. Under those circumstances, a new trial is necessary because the effect of such an error is to put the State at an advantage over the defendant who has unnecessarily been forced to expend a peremptory strike to correct the error. *See id.* at 23, 564 N.W.2d at 333.

■

¶ 25. However, in the inverse situation where a juror is improperly removed (as opposed to retained), the supreme court has held that automatic reversal is not necessary because, even though the prospective juror was improperly dismissed, the defendant was not required to expend a peremptory strike against the challenged juror. *See Mendoza*, 227 Wis. 2d at 856–64, 596 N.W.2d at 745–49. Instead, the analysis is conducted under the law of harmless error, asking

whether a fair and impartial jury nonetheless convicted the defendant. *See id.* at 864, 596 N.W.2d at 749.

### d. Subjective and Objective Bias Applied to This Case

#### 1. Subjective Bias

¶ 26. In this case, Judge Carlson did not have the benefit of the supreme court's recent decisions when he made his ruling regarding prospective juror Daniel K. Nonetheless, we view the judge's ruling as the functional equivalent of a determination that Daniel K. was not subjectively biased. Because the judge was able to observe Daniel K. in person, including his demeanor and the manner in which his words were spoken, we must give appropriate deference to the judge's assessment under the clearly erroneous test. *See Faucher,* 227 Wis. 2d at 718, 596 N.W.2d at 778.

¶ 27. When Judge Carlson asked Daniel K. if he could listen to the evidence and apply the law as explained by the court, Daniel K. responded: "I think I could." When told by Judge Carlson that he would have to react to the evidence presented, rather than to outside events, Daniel K. responded, "Right." It was not until defense counsel started posing questions based on hypothetical situations that Daniel K. expressed some hesitancy about whether he would be able to prevent outside factors from influencing him. When the prosecutor and defense counsel started arguing over the form of defense counsel's questions, Judge Carlson terminated the debate and paraphrased Daniel K.'s voir dire responses as, "He said it's hard to judge what [he] would feel and that he would try to base [his decision] on the evidence." With that, Judge Carlson rejected Jimmie's request to remove Daniel K. for cause.

¶ 28. Although Daniel K. gave varying responses during his voir dire and, at times, indicated some hesitancy about his ability to serve as a juror in light of his wife's past experience as a sexual assault victim, the supreme court has held that a prospective juror need not utter magical words in order to qualify as an acceptable juror. *See State v. Ferron*, 219 Wis. 2d 481 501, 579 N.W.2d 654, 662 (1998). In addition, the court has said that a prospective juror need not unambiguously state his or her ability to set aside bias. *See id.*; *Faucher*, 227 N.W.2d at 731 n.8, 596 N.W.2d at 784. Rather, a reviewing court looks to the trial court's resolution of the question from the standpoint of the trial judge's better position.

¶ 29. Judge Carlson was in a far better position than we are to evaluate Daniel K.'s conduct, demeanor, tone of voice and other nonverbal cues as the judge considered the ultimate question whether Daniel K. had exhibited any subjective bias. This evaluation is very much like a fact finder's assessment of a witness's credibility. That is why the supreme court has placed this determination under the "clearly erroneous" standard of appellate review. Giving due deference to the better position of Judge Carlson, we conclude that the judge's decision to retain Daniel K. as a juror in the face of Jimmie's challenge was not clearly erroneous.

¶ 30. We make a final observation regarding this matter based on the steady stream of juror selection cases that come before us. Because lawyers may ask leading questions on voir dire and because they are also skilled in obtaining ⁰ desired answers, the responses of a prospective juror to such questions are often contradictory, depending on which party is asking the questions. Thus, on appeal, both parties are

usually able to point to voir dire answers that support their competing positions regarding the challenged juror. Given this situation, it is all the more appropriate for us to defer to the trial court's better position to assess the prospective juror's credibility and honesty.

## 2. Objective Bias

¶ 31. Because the recent supreme court decisions had not yet been released at the time of the trial in this case, Judge Carlson did not make an express determination on the question of objective bias. The same situation existed in *Faucher*, but the supreme court nonetheless went on to decide the issue as a matter of law. *See Faucher*, 227 Wis. 2d at 732–35, 596 N.W.2d at 784–86. We will do the same here.

¶ 32. Daniel K. did not know, nor was he otherwise aligned in any manner with, any of the principals involved in this case. Thus, this case is not like *Faucher*. Nor did he exhibit any knowledge, much less any prejudice, towards any aspect of the case, particularly Jimmie's theory of defense. Thus, this case is not like *Kiernan*. In short, unlike the jurors in those cases, Daniel K. was not committed in advance against any aspect of Jimmie's case.

¶ 33. In addition, Daniel K.'s potential bias arises out of the experiences of his wife, not his own. Moreover, his wife's experience was remote in time, occurring when she was six years old. Even in the face of his wife's prior experience as a sexual assault victim, there is no showing that Daniel K. harbored a negative, ingrained attitude or predisposition regarding the judicial system that would preclude him from serving as a fair and impartial juror. Thus, the juror in this case is not like some of the jurors in *Mendoza*.

¶ 34. Factually, this case is more like *Erickson*. There, in a sexual assault case, the supreme court upheld a trial court ruling rejecting a challenge for cause against a prospective juror who had been the victim of a sexual assault as a child many years earlier. *See Erickson*, 227 Wis. 2d at 777, 596 N.W.2d at 759. The court disagreed with the defendant's claim that the juror was objectively biased. The court found nothing in the juror's voir dire responses which suggested that the juror was anything other than a person who was willing and able to act as an impartial juror. *See id*. The court further stated that it has "been 'repeatedly reluctant to exclude groups of persons from serving as petit jurors as a matter of law.' " *Id*. (quoted source omitted).

¶ 35. *Erickson* thus teaches that a prospective juror who has been victimized by the same kind of crime charged in the instant case may nonetheless qualify as a juror if the juror otherwise passes muster under the objective bias test. If that is so as to a juror who was a direct victim, it follows that the same can also be so as to the spouse of such a victim.

¶ 36. In summary, there is no showing that Daniel K. had any direct or personal connection with any persons involved in this case or with some important aspect of this case. Nor is there any showing that Daniel K. harbored a firmly held predisposition regarding the justice system that precluded him from fairly and impartially deciding the case. *See supra* at 8. Based upon all of the facts and circumstances surrounding Daniel K.'s voir dire and after a consideration of the recent cases, we conclude, as a matter of law, that Daniel K. was not objectively biased. We uphold

Judge Carlson's ruling rejecting the challenge for cause.

## 2. Admissibility of Child's Videotaped Statement

¶ 37. Next, Jimmie argues that the trial court erred by admitting Cassandra's videotaped interview into evidence. Jimmie contends that the State did not establish a threshold requirement for admissibility pursuant to § 908.08(3), STATS., namely that Cassandra understood that "false statements are punishable."

¶ 38. Section 908.08(3)(c), STATS., is part of the evidence code. It governs the admissibility of videotaped statements of children in various types of proceedings, including criminal trials. We set out the full statute in the accompanying footnote.[6] The statute

---

[6] Section 908.08(3), STATS., reads as follows:

**(3)** The court or hearing examiner shall admit the videotape statement upon finding all of the following:

(a) That the trial or hearing in which the videotape statement is offered will commence:

1. Before the child's 12th birthday; or

2. Before the child's 16th birthday and the interests of justice warrant its admission under sub. (4).

(b) That the videotape is accurate and free from excision, alteration and visual or audio distortion.

(c) That the child's statement was made upon oath or affirmation or, if the child's developmental level is inappropriate for the administration of an oath or affirmation in the usual form, upon the child's understanding that false statements are punishable and of the importance of telling the truth.

(d) That the time, content and circumstances of the statement provide indicia of its trustworthiness.

(e) That admission of the statement will not unfairly surprise any party or deprive any party of a fair opportunity to meet allegations made in the statement.

157

allows for evidentiary use of a child's videotaped statements subject to certain conditions. The condition at issue in this case is that set out at para. (3)(c), which requires that the child have an "understanding that false statements are punishable and of the importance of telling the truth."

■

¶ 39. Ordinarily, a determination of whether a child understands that false statements are punishable is a question of fact. *See State v. Tarantino*, 157 Wis. 2d 199, 209–11, 458 N.W.2d 582, 586–87 (Ct. App. 1990). However, since the only evidence on this question is the videotape itself, we are in as good a position as Judge Kennedy at the preliminary hearing and Judge Carlson at the trial proceedings to make that determination. As a result, the question becomes one that we review de novo. *See State v. Pepin*, 110 Wis. 2d 431, 439, 328 N.W.2d 898, 901–02 (Ct. App. 1982) ("We note that this against-interest statement is documentary; that it was made is undisputed; its maker chose not to testify and so no demeanor evidence exists. The trial court would be in no better position to determine this question of law than are we.") (footnote omitted).

¶ 40. We have reviewed the videotape. Regina Greetham, an investigator with the Lake Geneva police department, and Paula Hocking, a social worker with Walworth County Human Services, conducted the interview. At the beginning of the interview, the following exchange took place with Cassandra:

> [Social worker]: Cassie, do you know the difference between telling the truth and telling a lie? If I was to say that I was wearing a purple shirt today, is that telling the truth or telling a lie?
>
> Cassandra: Lie.

[Social worker]: Why?

Cassandra: Cause you have a green shirt on.

[Social worker]: Very good. Do you know how important it is to always tell the truth? Okay, it's real important to make sure that you tell us the truth today. Can you do that? You're shaking your head yes.

As the interview came to a close, Cassandra was asked again:

[Social worker]: Everything that we've talked about today is that the truth? Have you told us the truth?

[Police investigator]: And you're shaking your head.

Cassandra: Yeah.

¶ 41. Jimmie argues that these excerpts satisfy "the importance of telling the truth" prong of the statute, but not the "child's understanding that false statements are punishable" prong. He agrees with Judge Carlson that the exact words of the statute need not be used, but he contends that the words actually used must "demonstrate the child knows . . . that there are consequences in failing to tell the truth." We agree with this premise. Thus, the issue narrows to whether the exchanges between the interviewers and Cassandra satisfied this "punishment" prong of the statute.

¶ 42. At times, Jimmie's argument appears to treat the statutory provisions of "the importance of telling the truth" and "that false statements are punishable" as discrete and unrelated concepts. We disagree. We see the two as very much interrelated. We think that, in most instances, a reasonable child would associate a warning about the importance of telling the

159

truth with the related concept of untruthfulness and the consequences that might flow from such deceit.[7] We see nothing in the facts surrounding the interview with Cassandra which suggest that she did not make that association in this case.

¶ 43. First, we take note that the warnings given to Cassandra did not utilize only words about the importance of telling the truth. Rather, the social worker also twice used the word "lie" when cautioning Cassandra: "Cassie, do you know the difference between telling the truth and telling a *lie?* If I was to say that I was wearing a purple shirt today, is that telling the truth or telling a *lie*?" (Emphasis added.) And Cassandra replied that she understood that a "purple shirt" response would be a "lie."

¶ 44. Second, this interview was no ordinary event in Cassandra's life. Strangers in an unfamiliar setting were interviewing her about a difficult and sensitive topic. The solemnity and importance of such a moment would not be lost on a young child.

¶ 45. Considering the entire interview, the language employed and the surrounding circumstances, we conclude that the "punishment" prong was satisfied despite the lack of the express words recited in § 908.08(3)(c), STATS.

¶ 46. Alternatively, if the trial judges who ruled on this issue were in error, we hold that such error was harmless. The test for harmless error is "whether there is a reasonable possibility that the error contributed to the conviction." *State v. Dyess*, 124 Wis. 2d 525, 543, 370 N.W.2d 222, 231–32 (1985). Here, the error was

---

[7] The same would be true in the converse situation. When warned about the consequences of lying, a reasonable child would understand the importance of being truthful.

harmless because the essential information conveyed by the videotape was also admitted into evidence via other sources and means.

¶ 47. On the day that Cassandra was sexually assaulted, her brother, Mitchell, was also present at Jimmie's home. Mitchell became suspicious about what was going on upstairs in Jimmie's bedroom between Cassandra and Jimmie. Mitchell testified that he heard Jimmie tell Cassandra "hurry up and put on your dress" when he knocked on the locked door of the bedroom. Based on his suspicion, Mitchell called his mother.

¶ 48. Cassandra's mother, Lori, testified that after she went to Jimmie's home to pick up Cassandra and Mitchell, she discovered that Cassandra was not wearing any underwear. An ensuing search led to the underwear being discovered upstairs in Jimmie's bedroom on the floor, next to the bed. Lori also found Jimmie lying in bed, covered only by a sheet from the waist down.

¶ 49. Furthermore, all of the details of the assault that Cassandra gave during her videotaped interview were also told to others on several different occasions shortly after the event took place. First, Lori testified that when she, Cassandra and Mitchell returned home in the evening after the assault occurred, she and the victim went into her room to talk in private about what had happened. After some encouragement and reassurance, Cassandra described to Lori in detail the sexual acts that were performed on her by Jimmie. Second, the social worker who would later conduct the videotaped interview of Cassandra testified that she saw a "scared" and "tearful" child at the hospital the night of the assault. She also testified

that she had overheard Cassandra at the hospital tell her mother some of the details of the assault. Given this evidence from other sources, the videotape was, in effect, duplicative. As such, any error regarding the videotape did not contribute to Jimmie's conviction.

## CONCLUSION

¶ 50. We hold that Judge Carlson properly rejected Jimmie's challenge to remove juror Daniel K. for cause. We also hold that both Judge Kennedy and Judge Carlson properly ruled that the videotape was admissible evidence pursuant to § 908.08(3)(c), STATS. Alternatively, we hold that any error regarding the videotape was harmless. We affirm the judgment of conviction.

*By the Court.*—Judgment affirmed.