COURT OF APPEALS
DECISION
DATED AND FILED

July 17, 2025

Samuel A. Christensen
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No.     **2024AP1442-CR**

STATE OF WISCONSIN

Cir. Ct. No.  2021CF259

IN COURT OF APPEALS
DISTRICT IV

---

STATE OF WISCONSIN,

   PLAINTIFF-RESPONDENT,

 V.

PETER LAWRENCE HANDLEY,

   DEFENDANT-APPELLANT.

---

APPEAL from a judgment of the circuit court for Waushara County: GUY D. DUTCHER, Judge. *Affirmed*.

Before Blanchard, Graham, and Nashold, JJ.

**Per curiam opinions may not be cited in any court of this state as precedent or authority, except for the limited purposes specified in WIS. STAT. RULE 809.23(3).**

¶1      PER CURIAM.  Peter Handley was convicted of repeated sexual assault of a child following a jury trial.  On appeal, he argues that the circuit court erred by admitting a videorecorded interview of the child victim pursuant to WIS. STAT. § 908.08 (2023-24).[1]  Handley also argues that, even if the recorded interview was properly admitted, the evidence presented at trial was insufficient to support the conviction.  We reject Handley's arguments and affirm the judgment of conviction.

## BACKGROUND

¶2      The child victim, who we refer to as "Y.Z.," was no older than five years old at the time of the alleged assaults.[2]  Y.Z.'s biological parents were separated at that time and living in different residences.  Y.Z. primarily lived with her mother and Handley, who was her mother's boyfriend.  Y.Z. would also sometimes stay with her father, who lived with his girlfriend and her young son, A.B.

¶3      The sexual assault allegations at issue here were initially reported to child protective services by Y.Z.'s father, after he and his girlfriend observed what they considered to be concerning sexual conduct between Y.Z. and A.B., who was also five years old.  Y.Z.'s father and his girlfriend told police that they confronted Y.Z. and A.B. about this conduct, and Y.Z. told them that A.B. had placed his penis in Y.Z.'s buttocks.  When asked where they learned about that type of

---

[1]  All references to the Wisconsin Statutes are to the 2023-24 version.

[2]  To protect the privacy of the child victim, we refer to her and another witness using initials that do not correspond to their real names, and we refer to her father, her father's girlfriend, and her mother using those designations.  *See* WIS. STAT. RULE 809.86.

conduct, Y.Z. said that she learned this conduct from her "other dad," by which she meant Handley.[3]

¶4      As part of the ensuing investigation, Y.Z.'s biological father took her to the Safe Harbor Child Advocacy Center for a recorded forensic interview.  Y.Z. was five years old at the time, and the interview was conducted by a licensed clinical social worker who had been trained in methods for conducting forensic interviews of children.  During the interview, which we summarize in detail below, Y.Z. described various ways in which Handley had touched her with his "wiener," and she also talked about having "wiener parties" with A.B.

¶5      The State charged Handley with repeated sexual assault of the same child, contrary to WIS. STAT. § 948.025(1)(d).  As the jury trial approached, the State filed a notice of its intent to introduce the recording of the Safe Harbor interview at trial.  *See* WIS. STAT. § 908.08(1) (providing an alternative procedure that allows "audiovisual recording of an oral statement of a child who is available to testify" to be admitted as evidence in certain circumstances); § 908.08(2) (requiring a party that intends to offer the recording to file pretrial notice and the court to hold a pretrial hearing on admissibility).

¶6      Handley objected to its admission, arguing that the recording did not demonstrate that Y.Z. understood the importance of telling the truth or the difference between true statements and lies.  *See* WIS. STAT. § 908.08(3)(c) (if, as of the time of the recording, "the child's developmental level [was] inappropriate

---

[3] The record shows that Y.Z. referred to two different individuals, Handley and her biological father, as "dad."  Throughout this opinion, we attempt to clarify which of the two she was referring to when we can discern that information from context.

3

for the administration of an oath or affirmation in the usual form," the court must find, as a prerequisite to admissibility, that the child's statement was made "upon the child's understanding that false statements are punishable and of the importance of telling the truth"). Separately, Handley also argued that the recording did not contain sufficient "indicia of trustworthiness, as required under [§] 908.08(3)(d)."

¶7 The circuit court viewed the recording in preparation for the final pretrial conference. The recording depicted an energetic child who had evident difficulty maintaining her focus on the questions that she was being asked. Y.Z. was physically active throughout the interview, and she frequently responded to the interviewer's questions with non sequiturs on seemingly unrelated topics, such as asking the interviewer about various physical objects in the room. The interviewer was nevertheless able to elicit relevant information from Y.Z. by redirecting her attention, sometimes through repeated attempts at redirection.

¶8 Consistent with the requirements of WIS. STAT. § 908.08(3)(c), the interviewer sought to confirm Y.Z.'s understanding that false statements are punishable and of the importance of telling the truth. That portion of the exchange went as follows:

> Interviewer: So [Y.Z.], so how old are you?
>
> Y.Z.: Um [holding up five fingers].
>
> Interviewer: How many is that?
>
> Y.Z.: [counting] One, two, three, four, five!
>
> Interviewer: Five! So [Y.Z.] if I said you were eight, would I be right or wrong?
>
> Y.Z.: Right.
>
> Interviewer: Would I be right? Are you eight?

Y.Z.: Ah, no.

Interviewer: No, I would be wrong! So [Y.Z.] you tell me if I get something wrong, okay?

Y.Z.: Okay.

Interviewer: Okay. And when we're talking here, we're only going to tell the truth. [Y.Z.], do you know what it means to tell the truth?

Y.Z.: Um, it's, um, I don't know what it is.

Interviewer: You don't—okay, here, I'm going to give an example. Let's say there's a boy and a girl sitting next to each other eating lunch. And the boy takes the girl's juice box. And the girl says "Hey, did you just take my juice box?" And the boy says "No, no I didn't." Is he telling the truth or is he telling a lie?

Y.Z.: Him, him telling the truth.

Interviewer: He's telling the truth? Okay. Um, let's say there's another boy and another girl having lunch. And the boy pulls the girl's hair really hard. And the girl says "Did you just pull my hair?" and he says "No, I didn't do it." Is he telling the truth or is he telling a lie?

Y.Z.: Him telling a lie.

Interviewer: He's telling a lie. Okay. Now let's say there's another boy and another girl having lunch and the boy steals the girl's fruit snacks. And the girl says "Did you just take my fruit snacks?" and he says "Yes" and he gives them back. He's like "Here you go I'm sorry." Is he telling the truth or is he telling a lie?

Y.Z.: Him telling the truth.

Interviewer: He's telling the truth.

Y.Z.: And I like your necklace.

Interviewer: Oh, thank you. So, what happens if a kid is telling lies and a grownup finds out?

Y.Z.: Is, them say, "Mom and dad, can you please, take my fruit snacks?"

Interviewer: [Laughs] What—if somebody's telling a lie, and gets caught telling lies, what can happen?

5

Y.Z.: I don't know.

Interviewer: Does anybody get in trouble?

Y.Z.: Um, boys get in trouble!

Interviewer: Boys get in trouble. Is it a good thing to tell lies?

Y.Z.: No.

Interviewer: No. Do you understand it's really important to tell the truth here [Y.Z.]?

Y.Z.: It's really important --

Interviewer: --really important --

Y.Z.: --to tell the truth.

Interviewer: So, can you promise me to only tell me the truth today?

Y.Z.: Okay.

Interviewer: Okay, thank you.

¶9    During much of the remainder of the interview, the interviewer asked Y.Z. about Handley. At various points during the interview, Y.Z. described things that Handley had done with his "wiener," including placing it in her "butt," in her "hip" (pointing to her vaginal area), and in her "mouth." Y.Z. also said "dad do this to me" and made gestures that appeared to pantomime the act of performing fellatio. Additionally, throughout the interview, Y.Z. repeatedly turned the subject of conversation to physical objects in the room, and she evidently wanted to talk about her activities with A.B. The interviewer answered Y.Z.'s questions and listened to the information she provided about A.B., but repeatedly redirected the conversation back to Handley.

¶10    At the pretrial hearing, Handley argued that, based on Y.Z.'s answers to the interviewer's questioning about truth and falsity, the circuit court

could not find that Y.Z.'s statements were made "upon the child's understanding that false statements are punishable and of the importance of telling the truth." WIS. STAT. § 908.08(3)(c). Handley also renewed his argument that Y.Z.'s recorded statements lacked indicia of reliability due to the "suggest[ive] nature of the interview" § 908.08(d).

¶11 After hearing arguments from the parties, the circuit court determined that the recorded interview was admissible. It acknowledged that Handley's arguments were "well-grounded," and also acknowledged the challenges that the interviewer faced in interviewing Y.Z., whose "attention [did] not stay particularly focused for a very long period of time." However, the court determined, Y.Z. "articulate[d] pretty profoundly an understanding of the difference between telling the truth and telling a lie," and that "taken globally," she "demonstrated a sufficient understanding for the necessity of sharing truthful information with the interviewer." The court did not specifically address Handley's argument about the trustworthiness of Y.Z.'s recorded statements.

¶12 The case proceeded to a jury trial. The State presented testimony from a number of individuals, including the forensic interviewer, and it played the videorecording of the Safe Harbor interview for the jury. Y.Z., who was almost seven years old by the time of trial, was called as a witness. She testified that she was scared, and she appeared to be unable to answer some basic questions about her family and living situation. She testified that she remembered a time when she lived with her mom and "Peter [Handley]," who she identified at trial. When

asked about what she would do when she "spent time with Peter," Y.Z. testified: "I forgot."[4]

¶13    Handley moved for a directed verdict at the close of the State's case. The circuit court denied the request.

¶14    During closing arguments, the State argued that the jury should credit the statements that Y.Z. made in the recorded interview, which supported three separate acts of sexual assault in the relevant time period, as required by WIS. STAT. § 948.025.  Handley argued that the jury should not credit Y.Z.'s recorded statements.  More specifically, he argued that, under the circumstances and based on the evidence presented, the sexual assault allegations originated from Y.Z.'s father and his girlfriend, and that Y.Z. would have felt pressure from her father and his girlfriend to accuse Handley, as they expected her to do.  Handley also argued that the interviewer's questioning was suggestive, and that it led to allegations which, Handley argued, were false.

¶15    The jury found Handley guilty of the charged offense.  Handley filed this appeal, which is a direct appeal of the judgment of conviction.

**DISCUSSION**

¶16    On appeal, Handley argues that the circuit court erred in admitting the recording of the Safe Harbor interview, and that the evidence presented at trial was insufficient to support the conviction.  The State concedes that the evidence

---

[4] The State also presented testimony from Y.Z.'s father, his girlfriend, and other family members, and from various government agents involved in the investigation.

would be insufficient without Y.Z.'s recorded statements, but argues that the recording was properly admitted at trial.

¶17    We begin with the admissibility of the recorded statements. Generally speaking, we review evidentiary determinations by a circuit court under the clearly erroneous standard of review. Here, however, Handley points to *Jimmie R.R.*, which sets forth the de novo standard of review for this particular determination. *See* **State v. Jimmie R.R.**, 2000 WI App 5, ¶39, 232 Wis. 2d 138, 606 N.W.2d 196. Specifically, the *Jimmie R.R.* court stated that an appellate court is "in as good a position" as a circuit court to evaluate whether a recorded statement satisfies the criteria in WIS. STAT. § 908.08(3)(c).

¶18    The first question is whether the video satisfies WIS. STAT. § 908.08(3)(c). As noted, § 908.08(3)(c) provides that, "if the child's developmental level [at the time of the recording was] inappropriate for the administration of an oath or affirmation in the usual form," the child's statement must have been made "upon the child's understanding that false statements are punishable and of the importance of telling the truth."

¶19    We conclude that WIS. STAT. § 908.08(3)(c) is satisfied here. The exchange between the interviewer and Y.Z. on the topic of true and false statements is not perfect, but it is adequate to serve as a prerequisite to admissibility. Y.Z. said that she understood that it was not a good thing to tell lies and that it is important to tell the truth, she understood that some children can get in trouble for lying, and she promised to tell the truth. Moreover, the balance of the interview shows that Y.Z. exhibited a willingness to say no to questions that were posed to her, and to correct the interviewer when the interviewer said something that she believed was incorrect. For example, when asked whether she

9

changed her clothes that morning, Y.Z. said "No," and then, when asked a follow-up question, Y.Z., referring to her biological father, explained "My dad changed me." And when the interviewer asked "Did you drive here?" Y.Z. answered, "No, my dad drived here." *See **State v. Marks***, 2022 WI App 20, ¶¶28-30, 402 Wis. 2d 285, 975 N.W.2d 238 (in making a determination under § 908.08(3)(c), we are to review the recording as a whole, and not just the child's response to certain questions).

¶20 Handley takes issue with our conclusion about WIS. STAT. § 908.08(3)(c) for two reasons, but neither is persuasive.

¶21 Handley first points out that Y.Z. initially responded that she did not know what it meant to tell the truth; that Y.Z. initially said the interviewer was "right" when the interviewer said that Y.Z. was eight years old; and that she answered the interviewer's example about a boy stealing a girl's juice box incorrectly. Handley acknowledges that Y.Z. got the remaining examples right, but points out that, in total, Y.Z. correctly answered just half of the examples the interviewer gave.

¶22 Handley accurately quotes certain portions of the interview, but we do not agree with his interpretation of what those portions show. *See **Marks***, 402 Wis. 2d 285, ¶30 ("Whether a recording complies with WIS. STAT. § 908.08(3)(c) does not involve a rigid determination as to whether the child correctly answered every question."). On our independent view of the interview, it appears that Y.Z. began to respond correctly once she understood the hypothetical nature of the interviewer's examples, thereby demonstrating an age-appropriate understanding of the difference between true statements and lies.

¶23     Second, Handley argues that the interview does not show that Y.Z. understood that she could be punished for making false statements. Handley points out that it was always boys who were making false statements in the interviewer's examples, and that, when asked if "anybody get[s] in trouble" for "telling lies," Y.Z. responded that "boys get in trouble." From this, Handley argues that Y.Z.'s responses during the interview do not demonstrate that she understood that girls like her could also get in trouble for making false statements.

¶24     Again, we do not agree with this interpretation of the exchange between the interviewer and Y.Z. The interviewer's line of questioning could have been more exacting and she could have asked follow-up questions, but we are not grading the quality of the questioning. When viewed in context, we are not persuaded that Y.Z. was expressing an understanding that only boys get in trouble for lying. Rather, we are persuaded that Y.Z. was relating the question about whether "anybody get[s] in trouble" back to the interviewer's examples, and was correctly reporting that the boys who made false statements in those examples would get in trouble. That, when coupled with Y.Z.'s agreement that it is "not a good thing to tell lies," that it is "really important" to "tell the truth," and her promise to do so, is sufficient. *See Jimmie R.R.*, 232 Wis. 2d 138, ¶¶41-42 ("that false statements are punishable" and "the importance of telling the truth" are "interrelated" concepts, and "in most instances, a reasonable child would associate a warning about the importance of telling the truth with the related concept of untruthfulness and the consequences that might flow from such deceit").

¶25     We now turn to WIS. STAT. § 908.08(3)(d) and consider whether the "time, content, and circumstances of the [recorded] statement[s] provide indicia of trustworthiness." We conclude that they do. The interview took place shortly after the assaults allegedly occurred, when Y.Z.'s memory would have been fresh.

Y.Z. was interviewed by a licensed clinical social worker who had training on how to interview children. She described the assaults using language that appeared to be natural for a child of Y.Z.'s age and apparent cognitive ability, and she illustrated what she meant with a gesture that appeared to evoke her personal experience. Nothing that we see in the interview suggests on its face that she had been coached to give any particular narrative. Y.Z. spoke fondly of Handley at times, and nothing in her responses suggested that she had an ulterior motive to falsely accuse him. For all these reasons, we conclude that Y.Z.'s recorded statements contain the indicia of trustworthiness required by § 908.08(3)(d).

¶26 Handley argues that the trustworthiness of Y.Z.'s statements is undermined by the interviewer's questioning, which he characterizes as unduly suggestive. He relies heavily on one point early on in the questioning, when the interviewer indicated that Y.Z.'s biological father was physically present at the facility. At that point in the interview, Y.Z. had not yet responded to open-ended questioning by disclosing any sexual conduct by Handley, and the interviewer asked: "What else did you tell your dad who's here about your dad Peter [Handley]?" Handley also points out that whenever Y.Z. turned the conversation to A.B., the interviewer would attempt to refocus the conversation on Handley.

¶27 Under the circumstances, Handley argues, Y.Z. would have understood the interviewer to be pressuring her to repeat the allegations against Handley, whether or not they were true, because she would have understood that that's what her biological father expected her to say. He argues: "[Y.Z.] knew the answer expected by [her father and his girlfriend], and was just told that her father was there. They would not accept that [Y.Z.] learned this behavior with [A.B.]; it must have been someone else. They would accept Peter Handley as that person, and [Y.Z.] obliged."

12

¶28     We conclude that the interviewer's approach does not undermine the trustworthiness of Y.Z.'s statements to a degree that affects the admissibility of the recording.  As noted, some portions of the interview demonstrate that Y.Z. felt comfortable answering "no" to questions that were asked, and to correcting the interviewer when she suggested something that Y.Z. believed was incorrect.  The interviewer's evident purpose in referring to Y.Z.'s "dad who's here" was to distinguish between the two men who Y.Z. referred to as her dad.  And, although the interviewer focused the questioning on Handley, who was the subject of the investigation, she did not ask questions in a way that suggested a "right" answer. *Marks*, 402 Wis. 2d 285, ¶33.  Handley was free to cross-examine the interviewer about her method of questioning, and he was also free to argue that Y.Z.'s biological father pressured her into making false allegations, and indeed, this was the strategy that he pursued at trial.  However, under these circumstances, his critique about the interviewer's questioning does not undermine our confidence in the trustworthiness of Y.Z.'s recorded statements so as to make the recording inadmissible pursuant to WIS. STAT. § 908.08(3)(d).

¶29     Finally, Handley also makes the separate argument that, even if the recording was properly admitted, the trial evidence was insufficient to support the conviction.  We review the sufficiency of evidence under a deferential standard, and we uphold the jury's verdict only if the evidence "is so insufficient in probative value and force that it can be said as a matter of law that no trier of fact, acting reasonably, could have found guilt beyond a reasonable doubt."  *State v. Poellinger*, 153 Wis. 2d 493, 501, 451 N.W.2d 752 (1990).

¶30     Here, the only direct evidence of Handley's guilt were the statements Y.Z. made in the recorded interview, in which Y.Z. appears to describe at least three different sexual assaults within the pertinent time frame.  *See* WIS. STAT.

§ 948.025(1)(d) (setting forth the elements of the charged offense). There was nothing inherently incredible about Y.Z.'s statements, and the jury's verdict was always going to turn on its assessment of their credibility. It is true that a different jury might have weighed the evidence differently, and might have, for example, been persuaded by the defense argument that Y.Z. repeated false statements about Handley during her interview based on pressure from her biological father and his girlfriend. But our review of the sufficiency of the evidence is narrow, and we are not to reweigh the evidence and come to our own conclusion. It was up to the jury to decide whether to credit the statements that Y.Z. made during the interview, and in the end, the jury evidently believed them. We conclude that the evidence was sufficient to support the conviction.

¶31 For all these reasons, we reject Handley's arguments and affirm the judgment of conviction.

*By the Court.*—Judgment affirmed.

This opinion will not be published. *See* WIS. STAT. RULE 809.23(1)(b)5.