# COURT OF APPEALS OF WISCONSIN
## PUBLISHED OPINION

Case No.:        2020AP56-CR

Complete Title of Case:

### STATE OF WISCONSIN,

#### PLAINTIFF-RESPONDENT,

#### V.

### DANIEL J. REJHOLEC,

#### DEFENDANT-APPELLANT.

| | |
|---|---|
| Opinion Filed: | June 9, 2021 |
| Submitted on Briefs: | January 28, 2021 |
| Oral Argument: | |

| | |
|---|---|
| JUDGES: | Reilly, P.J., Gundrum and Davis, JJ. |
| Concurred: | |
| Dissented: | |

| | |
|---|---|
| Appellant ATTORNEYS: | On behalf of the defendant-appellant, the cause was submitted on the briefs of *Joseph N. Ehmann*, regional attorney manager, office of the state public defender of Madison. |
| Respondent ATTORNEYS: | On behalf of the plaintiff-respondent, the cause was submitted on the brief of *Sara L. Shaeffer*, assistant attorney general, and *Joshua L. Kaul*, attorney general. |

# COURT OF APPEALS
## DECISION
## DATED AND FILED

### June 9, 2021

Sheila T. Reiff
Clerk of Court of Appeals

**NOTICE**

**This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.**

**A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals.** *See* **WIS. STAT. § 808.10 and RULE 809.62.**

**Appeal No.    2020AP56-CR**

**STATE OF WISCONSIN**

Cir. Ct. No.  2017CF42

**IN COURT OF APPEALS**

STATE OF WISCONSIN,

   PLAINTIFF-RESPONDENT,

 V.

DANIEL J. REJHOLEC,

   DEFENDANT-APPELLANT.

APPEAL from a judgment and an order of the circuit court for Sheboygan County:  REBECCA L. PERSICK, Judge.  *Order affirmed; judgment reversed and cause remanded with directions.*

Before Reilly, P.J., Gundrum and Davis, JJ.

¶1     REILLY, P.J.  Daniel J. Rejholec was informed of and waived his rights under ***Miranda v. Arizona***, 384 U.S. 436 (1966), prior to his custodial interrogation.  Rejholec repeatedly denied the accusations of his interrogator for the

first half of his interrogation. One hour and seven minutes into the interrogation, the interrogator told Rejholec that he would be unable to testify at trial if he obtained a lawyer: "You're not going to get a chance to tell your story. So the jury is never going to hear your side of the story." The interrogator repeated this misrepresentation a few minutes later, telling Rejholec, "I'm trying to give you an opportunity to tell your side of the story before it's too late to be able to do that." Rejholec thereafter gave incriminating statements.

¶2 Rejholec moved to suppress his statements on both *Miranda* and *State ex rel. Goodchild v. Burke*, 27 Wis. 2d 244, 133 N.W.2d 753 (1965), grounds. An accused's rights during a custodial interrogation can be violated in one of two ways: (1) the government fails to give or inadequately informs an accused of the warnings and advisements required by *Miranda* before or during a custodial interrogation, and the accused fails to waive his or her rights (a *Miranda* waiver challenge); or (2) the government utilizes improper pressures against the accused, causing his or her statements to be involuntary (a *Goodchild* statement challenge). *See State v. Santiago*, 206 Wis. 2d 3, 12, 18, 556 N.W.2d 687 (1996); *State v. Jiles*, 2003 WI 66, ¶¶25-26, 262 Wis. 2d 457, 663 N.W.2d 798. The circuit court found Rejholec's *statements* voluntary but did not address his *waiver*.

¶3 Rejholec appeals from his judgment of conviction for repeated sexual assault of the same child, pursuant to WIS. STAT. § 948.025(1)(e) (2019-20),[1] and from the circuit court's order denying his motion for postconviction relief. We reverse. We agree that Rejholec's *statement* (*Goodchild* challenge) was voluntary, but we conclude that Rejholec's *waiver* (*Miranda* challenge) became invalid when

---

[1] All references to the Wisconsin Statutes are to the 2019-20 version unless otherwise noted.

2

his interrogator misrepresented his right to silence, his right to counsel, and his right to testify at trial. Accordingly, we remand with directions that the circuit court grant Rejholec's suppression motion.

¶4 We begin with a brief statement of facts, relate the pertinent portions of Rejholec's custodial interrogation and suppression hearing, set forth our standard of review, address interrogation law, and analyze Rejholec's *Goodchild* and *Miranda* challenges.

*Facts*

¶5 Rejholec was arrested on probable cause of sexually assaulting the fourteen-year-old daughter of his girlfriend. He was taken into custody and interrogated by Sheboygan Police Detective Eric Edson. The relevant facts for this appeal are all found within the video recording of the interrogation and will be related below. Rejholec does not dispute that prior to questioning, he was properly *Mirandized* and consented to questioning. Rejholec moved to suppress his custodial statements, via a *Miranda/Goodchild* hearing, on the ground that his confession was coerced and involuntary given the tactics used by Edson. The circuit court held an evidentiary hearing and denied Rejholec's motion. Rejholec pled no contest[2] and now appeals.[3]

---

[2] A circuit court's order denying a motion to suppress evidence may be reviewed on appeal from a judgment of conviction despite a defendant's plea. *See* WIS. STAT. § 971.31(10).

[3] Rejholec also appeals from an order denying his postconviction motion, requesting sentence modification. He does not challenge that order. The only issue raised on appeal is his challenge to the denial of the suppression motion.

*Interrogation*

¶6      Rejholec's interrogation lasted one hour and thirty-six minutes.[4]  The first accusation of sexual assault/contact was made thirty minutes into the interrogation.  Rejholec denied having sexual contact with the child and told Edson that the child was "a compulsive little liar" and "all she does is lie," including about Rejholec "touching her."  Edson then falsely told Rejholec that police had collected semen from the child's abdomen and vagina.  Rejholec denied that any semen found on the child would be his.  Edson countered, "What if it did come back to match your DNA, how would you explain that?"  Rejholec replied, "I have nothing to worry about, there's nothing on her."

¶7      Forty-one minutes into the interrogation, Rejholec denied showing the child pictures on the computer of "kids or adults naked."  Edson responded,

> I'm sitting here in this chair and I don't believe what you are saying, [and] I think a judge and a jury are going to have even more questions.  And when it gets to that point, you don't want a judge and a jury making judgment against you based on the fact that they think you are lying.  It's—the stuff always comes out in the end and you're not—if your attorney is any good they are probably not going to let you tell your side of the story.  They are probably not going to let you get in front of a jury so the jury is not going to hear your side of the story.  They are not going to—all they are going to know is that you lied.  Ok?

¶8      Forty-nine minutes into the interrogation, Rejholec asked for a restroom break, and when the interrogation resumed Edson asked Rejholec, "So

---

[4] Edson testified that the interview began at 8:40 p.m. and ended at 10:10 p.m.  Our independent review of the record indicates that the video was recording for one hour and thirty-six minutes, which included a short period of time when Rejholec was left alone in the interrogation room and when he left to use the restroom.

where do you want to start?" Rejholec agreed that the child was "pretty sexual for her age," and he explained that she did try "to put moves on [him]" but that he did not "give in to her." Edson responded, "When was the first time you ever had any sexual contact with her?" Rejholec said he did not have any sexual contact with the child. Edson then replied, "I don't believe you, alright…. If you're not going to take full responsibility for what happened it's going to be hard for me to help you in the long run … when I do my report to make sure that you get treated fairly."

¶9    At the fifty-five minute mark, Edson repeated his lie about the police taking "swabs of various different sources from [the child's] body" as well as samples "from "clothing as well as from bedsheets." Edson told Rejholec that "DNA evidence … doesn't lie." Edson continued, "I know that you had sexual contact with her. I know you did, and I'm going to prove it through forensic evidence," to which Rejholec responded, "How do you know? She's lying."

¶10    At the one hour and four minute mark, Rejholec denied that forensic evidence would prove that he had sexual contact with the child. Edson responded,

> [Y]ou just keep stacking up the lies and it gets worse and worse and worse for you until at some point the jury says we are going to make an example out of this guy. This guy clearly doesn't appreciate what he did. He has made no attempt to say he is remorseful or sorry about what happened. All he has done is lie. He has lied to the cop, to the DA's office.[5] He has lied, lied, lied, lied, lied ….

Edson then repeated his earlier threat, stating, "I don't want to see a jury say this is the guy we are going to make an example out of because [Rejholec] doesn't take responsibility. He clearly doesn't feel sorry for what happened."

---

[5] The record does not reflect that Rejholec had spoken to anyone in the D.A.'s office, and we assume the reference to "the cop" is referring to Edson.

5

¶11    At the one hour seven minute mark, Edson told Rejholec:

> [O]nce we are done talking, you and I are not going to have another chance to talk, [Rejholec]. Ok. Cause most likely you'll get an attorney, either through a public defender or you will hire an attorney yourself, and the first thing that attorney is going to tell you is you're not going to talk to the police anymore. *You're not going to get a chance to tell your story. So the jury is never going to hear your side of the story.*

(Emphasis added.)

¶12    Three minutes later, Rejholec denied Edson's accusation that he had sexual intercourse with and had ejaculated in the child and denied that the child masturbated him, but he admitted that "[s]he tried a little bit." Edson responded, "I have a feeling that we are going to find your semen … on her clothes or on her hands or on her abdomen. Did that happen?" Rejholec replied that police would not find that evidence. He then asked if he would go to prison. Edson explained,

> I don't know if you are going to jail or the prison, I really don't. A lot of it depends on your honesty and your willingness to say I'm sorry for what happened. People that don't show remorse and that society is afraid is going to do stuff like this again, they want to put them away for a long time…. But if you can explain yourself, and people can understand why what happened happened, then there is less of a need for the courts to feel we got to protect the public and give you opportunities to get your life back together, to not spend a lot of time in prison and to get back on track and to get some counseling and to … get back to where you should be.

When Rejholec denied the accusation that his penis was in the child's mouth, Edson accused Rejholec of "moving backwards" and reiterated that "you don't have any reason to trust me other than you have my word. I'm telling you that I am a man of my word, and I hope you believe me because I'm looking you in the eye, and I'm telling you that I'm a man of my word. And I'm here to help you out to get through this."

6

¶13     Rejholec then asked, "What about having a lawyer involved?"  Edson said, "I'm trying to give you an opportunity to tell your side of the story before it's too late to be able to do that …."  Edson continued, "*I'm here just to get the facts and to support your end of this to tell your story*," followed by a threat to tell the district attorney that Rejholec "lied" and "obstructed."  (Emphasis added.)  Edson concluded by telling Rejholec that "you know, right now, *I'm the one that is going to be able to help you the most I think by telling your story*."  (Emphasis added.)  Rejholec then made incriminating statements for the remaining fourteen minutes of the interrogation.

*Suppression Hearing*

¶14     Edson was the only witness at the suppression hearing.  Prior to interrogating Rejholec, Edson knew that the cell phones recovered during the search had not been inspected and that the child had not undergone any type of sexual assault or forensic examination to collect DNA evidence.  Edson admitted that he lied to Rejholec when he told Rejholec that police had taken swabs (DNA evidence) from the child's body and from bedding in the apartment.  Edson described his lying as "a strategy" that he "found … to be a useful technique that if someone has perpetrated a crime where DNA might be left behind that if they believe that that DNA was found that they would be more likely to admit what they had done."  Edson also lied to Rejholec about "a SANE examination, blankets, clothing, [and] use of a glow light," as he knew that police had collected no such evidence.  Edson further admitted using an interrogation strategy wherein he placed the blame for the sexual contact on the child to induce Rejholec to confess.

¶15     The circuit court found Rejholec's statement voluntary but did not discuss Rejholec's **Miranda** waiver challenge.  We agree with the court's findings

that Rejholec received proper *Miranda* warnings prior to questioning; that Edson spoke very casually, was dressed in plain clothes with his gun, badge, and radio not prominent, was the only officer in the room, was soft-spoken and seated; that Rejholec was not restrained; that he was not fearful or sleepy; that he was comfortable in asking for a restroom break; and that Rejholec appeared intelligent and physically and emotionally healthy. Rejholec was fifty-three years old and had never previously been arrested. We also agree with the court's finding that Rejholec did not "seem confused or intimidated by the process."

*Standard of Review*

¶16    "Whether evidence should be suppressed is a question of constitutional fact." *State v. Johnson*, 2007 WI 32, ¶13, 299 Wis. 2d 675, 729 N.W.2d 182 (citation omitted). We review a circuit court's findings of historical fact under a clearly erroneous standard and apply constitutional principles to those historical facts independently. *Id.* "Whether a waiver of the rights to silence and to counsel was knowingly, voluntarily and intelligently made is a question of law for our independent review." *State v. Ward*, 2009 WI 60, ¶17, 318 Wis. 2d 301, 767 N.W.2d 236. The question of the voluntariness of Rejholec's statements involves the application of constitutional principles to historical facts. *See id.*

¶17    In this case we have a video-recorded interrogation. Where a custodial interrogation is video recorded, we are in the same position as the circuit court to determine what occurred during the interrogation and therefore independently make that determination. *See State v. Jimmie R.R.*, 2000 WI App 5, ¶39, 232 Wis. 2d 138, 606 N.W.2d 196 (1999) (citing *State v. Pepin*, 110 Wis. 2d 431, 439, 328 N.W.2d 898 (Ct. App. 1982)).

*Law of Interrogation*

¶18    The Fifth Amendment privilege to remain silent in the face of government accusation is a substantive right and a "hallmark of our democracy." *Miranda*, 384 U.S. at 460 (citation omitted). *Miranda* warnings are a procedural safeguard aimed at "protecting a defendant's Fifth Amendment privilege against self-incrimination." *Withrow v. Williams*, 507 U.S. 680, 691 (1993); *see also State v. Halverson*, 2021 WI 7, ¶13, 395 Wis. 2d 385, 953 N.W.2d 847. The aim of *Miranda*[6] is to "assure that the individual's right to choose between silence and speech remains unfettered throughout the interrogation process" and that a "mere warning given by the interrogators is not alone sufficient to accomplish that end." *Miranda*, 384 U.S. at 469-70. Providing *Miranda* warnings and obtaining a waiver prior to interrogation does not end law enforcement's obligation to comply with *Miranda*. *See id.* at 469-70. The privilege against self-incrimination is applicable during the entire period of custodial interrogation, from beginning to end. *See id.* at 461-62, 469. Warnings are required both for the awareness of the privilege and

---

[6] In *Miranda v. Arizona*, 384 U.S. 436, 444 (1966) (footnote omitted), the United States Supreme Court held:

> [T]he prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination. By custodial interrogation, we mean questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way. As for the procedural safeguards to be employed, unless other fully effective means are devised to inform accused persons of their right of silence and to assure a continuous opportunity to exercise it, the following measures are required. Prior to any questioning, the person must be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed.

also the "consequences of forgoing it." *Id.* at 469. The privilege is fulfilled only when the accused is guaranteed the right "to remain silent unless he [or she] chooses to speak in the *unfettered* exercise of his own will." *Id.* at 460 (emphasis added) (quoting *Malloy v. Hogan*, 378 U.S. 1, 8 (1964)).

¶19 For statements made during a custodial interrogation to be admitted, the State has the burden to prove by a preponderance of the evidence that the defendant was adequately informed of his or her *Miranda* rights and waived them (*Miranda* challenge) and that the defendant's statements were voluntary (*Goodchild* challenge).[7] *Santiago*, 206 Wis. 2d at 12, 18-19; *see also* *Ward*, 318

---

[7] In *State v. Lee*, 175 Wis. 2d 348, 355-57, 499 N.W.2d 250 (Ct. App. 1993), we affirmed, citing United States Supreme Court precedent, that "the *Miranda* waiver needs to be knowing and intelligent as well as voluntary." *See also* *Colorado v. Spring*, 479 U.S. 564, 573 (1987). We explained, however, that under Wisconsin law, when seeking to admit statements made during custodial interrogation "the state must establish that the defendant was informed of his *Miranda* rights, understood them and intelligently waived them" and that under *State ex rel. Goodchild v. Burke*, 27 Wis. 2d 244, 133 N.W.2d 753 (1965), "the defendant's statement was voluntary." *Lee*, 175 Wis. 2d at 359 (citing *State v. Mitchell*, 167 Wis. 2d 672, 696, 482 N.W.2d 364 (1992)). "In the absence of countervailing evidence, once the state has established a prima facie case of waiver of *Miranda* rights and voluntariness of an in-custody statement, the statement should be admitted into evidence." *Lee*, 175 Wis. 2d at 359. We noted that

> [t]he *Mitchell* test does not explicitly require that a *Miranda* waiver be voluntary. The first prong of the test inquires about whether the defendant understood and intelligently waived his rights, and the second prong inquires into the voluntariness of the statement, but not necessarily the waiver. *Mitchell*, 167 Wis. 2d at 696. However, because of [*Colorado v. Connelly*, 479 U.S. 157 (1986)]'s holding that some police coercion is necessary in order to show involuntariness of either the *Miranda* waiver or the statement, as discussed below, the voluntariness component of a *Miranda* waiver is satisfied by a prima facie showing by the state of compliance with the second *Mitchell* prong, that dealing with the voluntariness of the statement.

*Lee*, 175 Wis. 2d at 359 n.7. Likewise, in *State v. Santiago*, 206 Wis. 2d 3, 18-19, 556 N.W.2d 687 (1996), our supreme court also affirmed the two dimension analysis in this state, although stating it in a slightly different way:

Wis. 2d 301, ¶21. "In order to be valid, a **Miranda** waiver must be knowing, voluntary and intelligent." **Ward**, 318 Wis. 2d 301, ¶30. A defendant's statements are voluntary if, based on the totality of the circumstances, the statements were "the product of a free and unconstrained will, reflecting deliberateness of choice, as opposed to the result of a conspicuously unequal confrontation in which the pressures brought to bear on the defendant by representatives of the State exceeded the defendant's ability to resist." **Id.**, ¶18 (citations omitted). We begin by addressing Rejholec's **Goodchild** challenge.[8]

---

> When the State seeks to admit into evidence an accused's custodial statement, both the United States and Wisconsin constitutional protections against compelled self-incrimination require that it make two showings. First, the State must prove that the accused was adequately informed of the **Miranda** rights, understood them, and knowingly and intelligently waived them. "[T]he waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." **Moran v. Burbine**, 475 U.S. 412, 421 (1986). Second, the State must prove that the accused's statement was given voluntarily.

(alteration in original; citations omitted). The bottom line being that voluntariness is a requirement for both a valid **Miranda** waiver as well as for the admissibility of the defendant's statements, and we must address whether, under the totality of the circumstances, the waiver of the **Miranda** rights was voluntary, knowing, and intelligent and also whether the statements made after the waiver were voluntary.

[8] While Rejholec's arguments before this court and the circuit court focused strongly on his **Goodchild** challenge, his arguments, like those in **Ward**, also straddled the **Miranda** waiver challenge: that his waiver was invalid due to the objectionable police conduct. *See **State v. Ward**,* 2009 WI 60, ¶21, 318 Wis. 2d 301, 767 N.W.2d 236.

### *Goodchild* Statement Challenge

¶20    Rejholec argues that Edson's use of a "Reid-style interrogation"[9] rendered his statements involuntary in violation of his right to due process.  Based upon our review of the video-recorded interrogation and current law applicable to *Goodchild* challenges, we agree with the circuit court that Rejholec's *statements* were voluntary despite Edson's use of false evidence, lies, and victim blaming.

¶21    The Fifth and Fourteenth Amendments require "that a confession be voluntary to be admitted into evidence." *Dickerson v. United States*, 530 U.S. 428, 433 (2000); *State v. Agnello*, 2004 WI App 2, ¶8, 269 Wis. 2d 260, 674 N.W.2d 594 (2003) ("Under the due process clause of the Fourteenth Amendment, confessions that are not voluntary are not admissible.").  As noted above, "[a] defendant's statements are voluntary if they are the product of a free and unconstrained will, reflecting deliberateness of choice, as opposed to the result of a conspicuously unequal confrontation in which the pressures brought to bear on the defendant by representatives of the State exceeded the defendant's ability to resist."

---

[9] The Reid interrogation technique was first developed in a manual for law enforcement published by John Reid and his coauthors.  Christopher Slobogin, *Manipulation of Suspects and Unrecorded Questioning: After Fifty Years of **Miranda** Jurisprudence, Still Two (or Maybe Three) Burning Issues*, 97 B.U. L. REV. 1157, 1160-61 & n.14 (2017).

> The practices recommended by Reid … almost all rely on some form of deception and can be categorized as follows: (1) "impersonation" (e.g., showing sympathy for the suspect, posing as a friend); (2) "rationalization" (e.g., suggesting that the confession will make the suspect feel better or appear honorable in the eyes of the community); (3) "evidence fabrication" (e.g., false statements that a codefendant has inculpated the suspect, that the suspect's fingerprints were found at the scene of the crime, and other means of insisting the suspect is guilty); and (4) "negotiation" (e.g., suggesting that, if the suspect confesses, more lenient punishment or release from detention is likely).

*Id.* at 1160-61.

***State v. Hoppe***, 2003 WI 43, ¶36, 261 Wis. 2d 294, 661 N.W.2d 407. "The pertinent inquiry is whether the statements were coerced or the product of improper pressures exercised by the" interrogator, which is "a necessary prerequisite for a finding of involuntariness." ***Id.***, ¶37. We consider the totality of the circumstances, balancing "the personal characteristics of the defendant against the pressures imposed upon the defendant by law enforcement officers." ***Id.***, ¶38.

> The relevant personal characteristics of the defendant include the defendant's age, education and intelligence, physical and emotional condition, and prior experience with law enforcement. The personal characteristics are balanced against the police pressures and tactics which were used to induce the statements, such as: the length of the questioning, any delay in arraignment, the general conditions under which the statements took place, any excessive physical or psychological pressure brought to bear on the defendant, any inducements, threats, methods or strategies used by the police to compel a response, and whether the defendant was informed of the right to counsel and right against self-incrimination.

***Id.***, ¶39 (citations omitted).

¶22    The judiciary has authorized the government to lie and fabricate evidence in pursuit of a confession. While ***Miranda*** warned against deceptive interrogation techniques, *see* ***Miranda***, 384 U.S. at 476 ("Moreover, any evidence that the accused was threatened, tricked, or cajoled into a waiver will, of course, show that the defendant did not voluntarily waive his privilege."), the ***Miranda*** Court imposed few limits on the use of such techniques and chose to protect suspects by requiring police to inform suspects of their constitutional right to remain silent and their right to an attorney prior to any custodial interrogation, *see* ***State v. Triggs***, 2003 WI App 91, ¶15, 264 Wis. 2d 861, 663 N.W.2d 396; Laurie Magid, *Deceptive Police Interrogation Practices: How Far Is Too Far?*, 99 Mich. L. Rev. 1168, 1174-75 (2001).

¶23   In *Frazier v. Cupp*, 394 U.S. 731, 737 (1969), for example, police falsely told Frazier that his codefendant had already confessed. Frazier sought to suppress his statements arguing that the police deception made them involuntary. *Id.* at 737, 739. *Frazier* held that lies told by police alone do not make a confession involuntary. *Id.* at 739. "The fact that the police misrepresented the statements that [the codefendant] had made is, while relevant, insufficient in our view to make this otherwise voluntary confession inadmissible. These cases must be decided by viewing the 'totality of the circumstances' …." *Id.* (citation omitted); *see also United States v. Velasquez*, 885 F.2d 1076, 1088 (3d Cir. 1989) (noting that lies are "simply one factor to consider out of the totality of the circumstances"). Likewise, in *State v. Fehrenbach*, 118 Wis. 2d 65, 66-67, 347 N.W.2d 379 (Ct. App. 1984), this court adopted the conclusion reached in *Frazier* and held that "an interrogator's use of deceit, while relevant, does not by itself make an otherwise voluntary confession inadmissible."

¶24   In *Triggs*, we noted that a lie that relates to a suspect's connection to the crime is the least likely to render a confession involuntary. *Compare Triggs*, 264 Wis. 2d 861, ¶19 (quoting *Holland v. McGinnis*, 963 F.2d 1044, 1051 (7th Cir. 1992)), *with Lynumn v. Illinois*, 372 U.S. 528, 533-34 (1963) (suspect told she would lose welfare benefits and custody of children); *Rogers v. Richmond*, 365 U.S. 534 (1961) (police threatened to take suspect's wife into custody). We explained that while a lie relating to the crime

> may cause a suspect to confess, … causation alone does not constitute coercion; if it did, all confessions following interrogations would be involuntary because "it can almost always be said that the interrogation caused the confession." Thus, the issue is not causation, but the degree of improper coercion …. Inflating evidence of [the defendant's] guilt interfered little, if at all, with his "free and deliberate choice" of whether to confess, for it did not lead him to consider anything beyond his own beliefs regarding his actual guilt or innocence, his moral sense of right and wrong, and his

14

> judgment regarding the likelihood that the police had garnered enough valid evidence linking him to the crime. In other words, the deception did not interject the type of extrinsic considerations that would overcome [the defendant's] will by distorting an otherwise rational choice of whether to confess or remain silent.

*Triggs*, 264 Wis. 2d 861, ¶19 (alterations in original) (quoting **Holland**, 963 F.2d at 1051).

¶25 Edson utilized most, if not all, of the Reid technique tactics during Rejholec's interrogation. Although the propriety of the Reid technique has been questioned by legal scholars, *see, e.g.*, Christopher Slobogin, *Manipulation of Suspects and Unrecorded Questioning: After Fifty Years of* **Miranda** *Jurisprudence, Still Two (or Maybe Three) Burning Issues*, 97 B.U. L. REV. 1157, 1161-67 (2017), Rejholec offers no authority concluding that the use of the Reid technique itself creates a coercive environment, and, given the state of our law, we cannot so find.

¶26 We have reviewed the entirety of Rejholec's video-recorded confession and have examined the totality of the circumstances surrounding Rejholec's statement, balancing Rejholec's personal characteristics against Edson's tactics. *See* **Hoppe**, 261 Wis. 2d 294, ¶¶38-39. We agree with the circuit court that Rejholec's statements were the voluntary product of his free and unconstrained will. While Edson did pressure Rejholec, we agree with the circuit court that it was "not in a way that I think rises to the level of overcoming the defendant's will." Edson's lies regarding DNA and cell phone evidence were directly related to Rejholec's connection to the crimes he was accused of. Despite the lies, Rejholec stood his ground that no forensic evidence would prove his guilt. We also agree that Edson's attempts to blame the victim and his use of other Reid techniques failed to rise to the level of improper coercion that caused Rejholec to confess. *See* **Holland**, 963 F.2d at 1051 ("[I]t did not lead [the suspect] to consider anything beyond his own

beliefs regarding his actual guilt or innocence, his moral sense of right and wrong, and his judgment regarding the likelihood that the police had garnered enough valid evidence linking him to the crime.").

¶27 Edson's tactics may have crossed the constitutional line with a different person, but we are satisfied that Rejholec's will was not overcome by the government's deceit and fabrication of evidence. Rejholec's decision to make *statements* against his personal interest was the result of "a free and unconstrained will, reflecting deliberateness of choice, as opposed to the result of a conspicuously unequal confrontation in which the pressures brought to bear on the defendant by representatives of the State exceeded the defendant's ability to resist." *See Hoppe*, 261 Wis. 2d 294, ¶36. Under the totality of the circumstances, Rejholec's *statements* were voluntary. Nonetheless, as will be discussed below, while his statements were voluntary, those statements made after Rejholec was misled as to his Fifth Amendment rights must be suppressed, as his *Miranda* waiver became invalid.[10]

*Miranda* Waiver Challenge

---

[10] We note that "[a] finding that statements were obtained in violation of *Miranda* does not inexorably lead to a finding of involuntariness with the attendant prohibition against impeachment use of the statements." *State v. Mendoza*, 96 Wis. 2d 106, 118, 291 N.W.2d 478 (1980). This is known as the impeachment exception. "A statement of the defendant made without the appropriate *Miranda* warnings, although inadmissible in the prosecution's case-in-chief, may be used to impeach the defendant's credibility if the defendant testifies to matters contrary to what is in the excluded statement." *Mendoza*, 96 Wis. 2d at 118 (citing *Harris v. New York*, 401 U.S. 222 (1971)). "It is only if the statements are also found to be involuntary that their use for impeachment purposes is precluded." *Id.* at 118-19.

¶28 Rejholec argues that Edson's use of lies about the legal process and the consequences of his invoking his right to counsel rendered his statements involuntary in violation of his right to due process. Specifically, Rejholec argues that Edson's statement that he would never be able to tell the jury his side of the story unless he gave a statement was a lie that undermined the purpose and substance of the *Miranda* warnings. According to Rejholec, "[t]his error alone should be sufficient for this court to rule Rejholec's subsequent admissions involuntary." We conclude that Edson's misrepresentations as to Rejholec's Fifth Amendment rights—specifically that Rejholec would not be able to testify at trial if he got a lawyer and that he would not be able to testify unless he gave Edson a statement—made Rejholec's *Miranda* waiver invalid.

¶29 Where the State seeks to admit evidence obtained during an accused's custodial interrogation, it must show that he or she was adequately informed of his or her constitutional rights against compelled self-incrimination (*Miranda*) and that he or she validly waived those rights. *Santiago*, 206 Wis. 2d at 18. "*Miranda* holds that '[the] defendant may waive effectuation' of the rights conveyed in the warnings 'provided the waiver is made voluntarily, knowingly and intelligently.'" *Moran v. Burbine*, 475 U.S. 412, 421 (1986). This examination "has two distinct dimensions." *Id.* "First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception." *Id.* And "[s]econd, the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." *Id.* "Only if the 'totality of the circumstances surrounding the interrogation' reveals both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the *Miranda* rights have been waived." *Id.* (citation omitted).

17

¶30     It is the second aspect of the waiver rule—the necessary "requisite level of comprehension"—that is implicated here. *See id.* Edson violated ***Miranda*** when he falsely told Rejholec during the interrogation that Rejholec would not be able to testify at trial unless he gave a statement to police: "You're not going to get a chance to tell your story. So the jury is never going to hear your side of the story. They are never going to be able to hear that you are sorry…. This is your opportunity to tell the truth and to tell your side of the story." Edson went on, explaining that he was "trying to give [Rejholec] an opportunity to tell [his] side of the story *before it's too late* to be able to do that," and he told Rejholec that "I'm here just to get the facts and to support your end of this to tell your story."[11] (Emphasis added.) These statements impermissibly suggested to Rejholec that if he exercised his right to silence and obtained a lawyer that Rejholec would not get the chance to tell his story to the jury. This was clearly untrue. Regardless of whether or not Rejholec provided Edson with a statement explaining his version of events, Rejholec has a constitutional right to testify and to defend himself at trial, which

---

[11] Initially, Edson stated to Rejholec:

> [I]f your attorney is any good they are probably not going to let you tell your side of the story. They are probably not going to let you get in front of a jury so the jury is not going to hear your side of the story. They are not going to—all they are going to know is that you lied. Ok?

Standing alone, we do not consider that remark made approximately forty-five minutes into the interrogation constitutionally impermissible under ***Miranda***. While a lawyer cannot prevent a client from testifying, we would agree that a fair inference of this statement could be that a lawyer would not recommend that his client testify. Edson, however, then followed up this intimation with express words at a little over an hour into the interrogation that if Rejholec did not provide a statement that he would not be able to testify at trial, that a jury would not hear his version of the story, and that Edson was the one who was "here" to "tell" Rejholec's story.

counsel may not prevent.[12] *See State v. Arredondo*, 2004 WI App 7, ¶11, 269 Wis. 2d 369, 674 N.W.2d 647 (2003) ("A defendant's right to testify is a fundamental constitutional right."); *see also* WIS. CONST. art. I, § 7 ("In all criminal prosecutions the accused shall enjoy the right to be heard by himself and counsel; to demand the nature and cause of the accusation against him; to meet the witnesses face to face …."). And Rejholec's defense counsel, far from preventing Rejholec from testifying, would be duty-bound to fully advise Rejholec of this fundamental right. *See, e.g.*, *State v. Denson*, 2011 WI 70, ¶65, 335 Wis. 2d 681, 799 N.W.2d 831. Edson crossed the constitutional line when he told Rejholec that unless he gave a statement that Rejholec would not be able to testify at his trial.

¶31 Given the totality of the circumstances, Edson's repeated misrepresentation of Rejholec's constitutional right to silence, to an attorney, and to testify at trial created an interrogation in which Rejholec was misled as to his Fifth Amendment rights, rendering his waiver of those rights constitutionally invalid. *See Moran*, 475 U.S. at 421 ("[T]he *waiver* must have been made with a full awareness

---

[12] Although the right to testify at trial is not one of the warnings the court in *Miranda* specifically enumerated as required, *see Miranda*, 384 U.S. at 444, the United States Supreme Court has previously recognized that the right to testify on one's behalf derives from several provisions of the Constitution, including the Fourteenth, Sixth, and Fifth Amendments, *State v. Lagrone*, 2016 WI 26, ¶¶19-26, 368 Wis. 2d 1, 878 N.W.2d 636. The Court in *Rock v. Arkansas*, 483 U.S. 44, 52 (1987), explained that a defendant's right to testify is a "necessary corollary to the Fifth Amendment's guarantee against compelled testimony." Likewise, the Court in *Miranda* was clear that "procedural safeguards" were necessary "to secure the privilege against self-incrimination," *Miranda*, 384 U.S. at 444, and "[the Fifth Amendment's privilege against self-incrimination] is fulfilled only when an accused is guaranteed the right 'to remain silent unless he chooses to speak in the unfettered exercise of his own will.' … The choice of whether to testify in one's own defense … is an exercise of the constitutional privilege," *Rock*, 483 U.S. at 53 (alteration in original) (quoting *Harris*, 401 U.S. at 230); *see also Lagrone*, 368 Wis. 2d 1, ¶22 ("[A] privilege against self-incrimination is exercised when an accused decides whether to testify …"). Thus, Edson's misstatement regarding Rejholec's right to testify impacted his understanding of his Fifth Amendment rights and, accordingly, the validity of his *Miranda* waiver.

of both the nature of the right being abandoned and the consequences of the decision to abandon it." (emphasis added)). Rejholec could certainly have remained silent during his interrogation and still testified at trial. Edson also misrepresented Rejholec's constitutional right to counsel, as it is not true that if Rejholec were to exercise his right to counsel, that the jury would not then have been able to hear his story. By phrasing his statements in this way, Edson was suggesting that Rejholec would suffer adverse legal consequences for invoking his rights,[13] *see **Doyle v. Ohio***, 426 U.S. 610, 618 (1976) ("[W]hile it is true that the ***Miranda*** warnings contain no express assurance that silence will carry no penalty, such assurance is implicit to any person who receives the warnings."), or, more accurately, Edson lied about what those adverse legal consequences would be. Edson repeated these claims and misstatements pertaining to Rejholec's rights multiple times during the interrogation and reinforced the idea that this was Rejholec's only opportunity to tell his story. It is significant that Rejholec's incriminating statements came only after Edson misrepresented Rejholec's constitutional right to remain silent, to an attorney, and to testify at trial.

¶32 No case on point exists in Wisconsin, but in ***Commonwealth v. Novo***, 812 N.E.2d 1169 (Mass. 2004), a similar interrogation took place. Novo was taken into custody regarding the death of his girlfriend's toddler. ***Id.*** at 1171. Novo was properly given his ***Miranda*** warnings, which he waived. ***Novo***, 812 N.E.2d at 1171. For the first hour and one-half, Novo denied involvement in the toddler's death. Novo's interrogators used the same tactics Edson did: the use of false evidence and

---

[13] In ***Miranda***, the court explained that the right to counsel under the Fifth Amendment is guaranteed "to assure that the individual's right to choose between silence and speech remains unfettered throughout the interrogation process." ***Miranda***, 384 U.S. at 469. The requirement that the right remain unrestrained or uninhibited necessarily means that the defendant must be allowed to invoke the rights without being threatened with untrue legal consequences for such invocation, as occurred in this case.

empathy for Novo by placing blame on the toddler. *Id.* at 1172. Novo continued to deny involvement in the toddler's death. The interrogators then told him: "If you don't give us a reason[,] … if you don't give us a reason right now why you did this, a jury's never going to hear a reason." *Id.* The interrogators persisted,

> suggesting over and over again that Novo's right to tell his side of the story to a jury was conditioned on his revealing it to them during the interview: e.g., "If you don't give us a reason … a jury's never going to hear a reason"; "If you don't give us the reason … a jury's never going to hear your side of the story"; "if you don't, [Novo], they're not going to hear it"; "Give your version of the story now, or they're not going to understand what happened"; "So if you can't explain what happened, [the autopsy pictures are] all they're going to show."

*Id.* at 1174-75 & n.4. Novo's interrogators then told him that his statements given in the interrogation would be his only opportunity to tell his side of the story, which the court described as a "now-or-never" tactic. *Id.* at 1172. Novo thereafter confessed. *Id.* at 1173.

¶33 The *Novo* court found that the "now-or-never" tactic was linked to Novo's right to testify and his right to present a defense, and the "now-or-never" statements by the interrogators were "plainly untrue" as "the right to testify on one's own behalf in a criminal case is fundamental." *Id.* at 1174 (citation omitted). The court found that the misrepresentation of Novo's right to defend himself at trial was a "particularly egregious intrusion" on Novo's fundamental rights that "irretrievably tainted his confession." *Id.* at 1175. The "now-or-never" theme began at the ninety-minute mark of Novo's interrogation, and the court found that the statements prior to that point were voluntary. *Id.* at 1176. The court suppressed Novo's statements made after the "now-or-never" misrepresentation by the interrogators and remanded the case to the trial court with instructions that any statements after the "now-or-never" comments must be excluded. *Id.* at 1177.

21

¶34 While "[t]he Constitution does not require that a criminal suspect know and understand every possible consequence of a waiver of the Fifth Amendment privilege," *Colorado v. Spring*, 479 U.S. 564, 574 (1987) (citing *Moran*, 475 U.S. at 422), Edson misrepresented Rejholec's right to counsel, right to silence, and right to testify, and as a result, Rejholec's waiver was not "made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it," *see Moran*, 475 U.S. at 421. Given these misrepresentations, Rejholec could not validly waive his *Miranda* rights as he did not have the "requisite level of comprehension." *See Moran*, 475 U.S. at 421. As the Court explained in *Miranda*, "any evidence that the accused was threatened, *tricked*, or cajoled into a waiver will, of course, show that the defendant did not voluntarily waive his privilege." *Miranda*, 384 U.S. at 476 (emphasis added). Under the totality of the circumstances, Edson invalidated the *Miranda* warnings he gave to Rejholec prior to the interrogation when he misrepresented Rejholec's Fifth Amendment rights at the one hour seven minute mark. All statements made by Rejholec after the one hour and seven minute mark of the interrogation shall be suppressed.

*Conclusion*

¶35 Words matter. Edson's words beginning at the one hour and seven minute mark were a constitutional misrepresentation of Rejholec's rights under the Fifth Amendment. Rejholec's *Miranda* waiver was invalid from that point forward as not being knowing, voluntary, and intelligent, and therefore the statements thereafter must be suppressed. We reverse the judgment of conviction and remand

to the circuit court with directions to enter an order granting Rejholec's motion to suppress statements made after the one hour and seven minute mark. We agree with the State that the circuit court may then entertain a motion to withdraw Rejholec's plea.[14]

*By the Court.*—Order affirmed; judgment reversed and cause remanded with directions.

---

[14] Rejholec asks that we grant his request for plea withdrawal. We decline to do so as WIS. STAT. § 971.31(10) appeals are subject to the harmless error test. *State v. Semrau*, 2000 WI App 54, ¶22, 233 Wis. 2d 508, 608 N.W.2d 376; *see also State v. Armstrong*, 223 Wis. 2d 331, 368-71, 588 N.W.2d 606 (1999). "In a guilty plea situation following the denial of a motion to suppress, the test for harmless error on appeal is whether there is a reasonable possibility that the erroneous admission of the disputed evidence contributed to the conviction." *Semrau*, 233 Wis. 2d 508, ¶22; *see also Armstrong*, 223 Wis. 2d at 370-71.